Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com

Hearing Date:  May 21, 2009
Hearing Time:  10:00 AM (EDT)
Objection Deadline: May 14, 2009

*Attorneys for Irving H. Picard,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | No. 09-11893 (BRL) |
| BERNARD L. MADOFF, | |
| Debtor. | Chapter 7 |

300006593

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................................1

RELEVANT PROCEDURAL HISTORY ..................................................................4

RELEVANT FACTUAL BACKGROUND.................................................................7

    I.    Madoff and BLMIS................................................................................7

       1.  History of BLMIS ..............................................................................7

       2.  Payments from BLMIS .....................................................................8

       3.  Misuse of BLMIS Funds ...................................................................8

    II.   The Trustee's Administration of the BLMIS Estate ..................................11

LEGAL ARGUMENT ............................................................................................11

    I.    The Legal Standard for  Substantive Consolidation has Been Satisfied.......................12

    II.   The Facts of this Case Warrant Substantive Consolidation .........................................14

       1.  Madoff and BLMIS were a single economic unit....................................14

       2.  The accounts of Madoff and BLMIS are hopelessly entangled ..................16

       3.  Creditors will benefit from substantive consolidation and will not be prejudiced ........18

       4.  Substantive consolidation is administratively efficient and economical .....................19

CONCLUSION ......................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## CASES

FDIC v. Colonial Realty Co.,
    966 F.2d 57, 59 (2d Cir. 1992) ............................................................ 12

In re 599 Consumer Elec. Inc.,
    195 B.R. 244, 250 (S.D.N.Y. 1996) ..................................................... 13

In re Augie/Restivo Banking Co., Ltd,
    860 F.2d 515 (2d Cir. 1988) .......................................................... 13, 14

In re Baker & Getty Fin. Servs., Inc.,
    106 F.3d 1255 (6th Cir. 1997) .............................................................. 14

In re Commercial Envelope Mfg. Co.,
    14 C.B.C. 191, 196 (Bankr. S.D.N.Y. 1977) ....................................... 13

In re GC Cos., Inc.,
    274 B.R. 663, 672 (Bankr. D. Del. 2002) ............................................ 12

In re Gulfco Inv. Corp.,
    593 F.2d 921 (10th Cir. 1979) ............................................................. 12

In re Lewellyn,
    26 B.R. 246 (Bankr. S.D. Iowa 1982) .................................................. 14

In re Owens Corning,
    419 F.3d 195 (3d Cir. 2005) ................................................................ 13

In re Park South Securities, LLC,
    No. 03-8024A (RDD) (Bankr. S.D.N.Y.) ............................................. 14

SEC v. Madoff, et al.,
    No. 08-Civ-10791 (S.D.N.Y., April 1, 2009) ........................................ 6

United States v. Madoff,
    No. 08 CV 2735 ..................................................................................... 4

## STATUTES

11 U.S.C. § 105(a) ........................................................................................ 1

11 U.S.C. §§ 101 et seq. ............................................................................... 1

15 U.S.C. § 78aaa et seq. ............................................................................. 1

78eee(a)(3) .............................................................................................. 4, 5

78eee(a)(4)(A) ............................................................................................. 5

78eee(b)(3) .................................................................................................. 5

78eee(b)(4) .................................................................................................. 5

78ff ............................................................................................................. 4

78fff(b) ............................................................................................................. 1, 11

78fff-1(a) ............................................................................................................... 11

78j(b) ...................................................................................................................... 4

78*lll*(4) .................................................................................................................... 2

78*lll*(7)(B) .............................................................................................................. 4

## REGULATIONS

17 C.F.R. 240.10b-5 ................................................................................................. 4

## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR ENTRY OF ORDER SUBSTANTIVELY CONSOLIDATING THE ESTATE OF BERNARD L. MADOFF INTO THE SIPA PROCEEDING OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC

Irving H. Picard, trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Corporation Act, 15 U.S.C. § 78aaa et seq. ("SIPA")[1], and the Securities Investor Protection Corporation ("SIPC"), by their respective counsel, respectfully submit this Memorandum of Law in support of their joint motion ("Motion") for entry of an order, pursuant to 11 U.S.C. § 105(a),[2] substantively consolidating the Chapter 7 estate of Bernard L. Madoff ("Madoff") into the SIPA proceeding of BLMIS, and relying upon the facts set forth in the Affidavit of Michael Slattery, Jr. (the "Slattery Affidavit") filed herewith, respectfully state:

## Preliminary Statement

This application for relief is based on facts readily apparent to those familiar with Madoff and BLMIS and will be proven conclusively by the evidence presented below. For decades, Bernard L. Madoff Investment Securities LLC ("BLMIS") was Bernie Madoff and Bernie Madoff was BLMIS, each the alter ego of the other. This entanglement permitted Madoff, at his whim and desire, to engage in innumerable financial transactions wherein he essentially used BLMIS as his personal "piggy bank," having BLMIS pay for his lavish lifestyle and that of his family. Madoff used BLMIS to siphon funds which were, in reality, other people's money, for his personal use and the benefit of his inner circle. Plain and simple, he stole it.

---

[1] For convenience, subsequent references to SIPA shall omit "15 U.S.C."

[2] For convenience, subsequent references to any provision of title 11, United States Code, 11 U.S.C. §§ 101 et seq., as applicable to this liquidation proceeding under 15 U.S.C. § 78fff(b), will refer only to the section of the Bankruptcy Code and omit reference to title 11.

As is now widely known, BLMIS received billions of dollars from customers on the pretense that it would invest those funds and generate significant and steady returns as a result of Madoff's particular investment strategy. In fact, none of that happened. Masking the fact that no securities were purchased for customers and thus no profits were ever generated, BLMIS, at Madoff's instruction, manufactured account statements that reflected the customers' deposits and withdrawals and showed the significant returns that were inexplicably guaranteed with an investment account at BLMIS. Whenever customers needed to redeem their investments, BLMIS paid them promptly as though their investments and cash were secure. In reality, Madoff simply stole other customers' money and gave it to the particular customers redeeming at that moment. Viewed another way, the funds entrusted by customers were utilized by Madoff to lull all of BLMIS's customers into the false belief that Madoff's phony scheme was indeed operating to their benefit. The grist of the BLMIS mill was customer property,[3] the essence of a Ponzi scheme.

Thus, whenever BLMIS paid its employees, paid redemptions to customers, paid for Madoff's yachts, homes and family enterprises, it did so with the customer property entrusted to Madoff to invest through the investment advisory business of BLMIS. As will be demonstrated, Madoff simply viewed that customer property as his own to do with as he pleased and maintained no distinction between BLMIS and himself. By way of example, Madoff loaned his brother, Peter Madoff, $9 million, and funded this loan exclusively from BLMIS. As we now know, the reality of this transaction is that Peter Madoff received $9 million of customer property. In exchange, Peter Madoff made a note payable to Madoff individually, and not

---

[3] "Customer Property" is a defined term under SIPA. Section 78*lll*(4) of SIPA defines customer property as "cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converterted …."

BLMIS.   Rather than promise to pay back BLMIS, Peter Madoff promised to pay the thief, Bernie Madoff.

As demonstrated by the preceding example, of which there are numerous others, any effort to try to separate Madoff from BLMIS is bereft of logic and financial support.   It is virtually impossible to separate Madoff's affairs from those of BLMIS.   The economic entwinement of Madoff and BLMIS is so complete and thorough that it is impossible to unravel. For this and other reasons, consolidation of the two liquidation proceedings of BLMIS and Madoff is appropriate.

The paramount goal of any effort by either court-appointed trustee is to help those injured by this sordid scheme.   Having two parallel proceedings will only result in wasted efforts and additional administrative expense, all to the detriment of those whom Madoff and BLMIS jointly victimized.   Consolidating the two proceedings, however, will promote economy and efficiency. Because there is a total overlap between those who possess fraud claims against Madoff and those who invested with BLMIS, consolidation will not result in any prejudice to any investor. Furthermore, the largest claim in the Chapter 7 case is held by the Trustee, whether on behalf of the estate of BLMIS or on behalf of BLMIS customers, who have and will assign their claims, at least in part, to the Trustee.   It makes little sense to have two trustees each doing essentially the same things to investigate the fraud, recover assets, and distribute them pursuant to two different distribution schemes to investors.   Accordingly, having one fiduciary who can use the powers afforded him by the Bankruptcy Code and the additional authority of SIPA in one consolidated proceeding before this Court will maximize value for the benefit of all of those defrauded.

Moreover, unlike a Chapter 7 trustee who is paid out of the proceeds of the liquidation – thereby reducing the amount available to pay creditors by the amount of his fees and

commissions and the fees of any attorneys, financial advisors and other professionals he retains – all such expenses are funded by SIPC (to the extent the general estate is insufficient) in the SIPA proceeding. Accordingly, the gross amount obtained by the Trustee will be available to repay those defrauded by BLMIS and Madoff. Consolidation of the Madoff estate into the SIPA proceeding of BLMIS is necessary to ensure that the maximum possible recovery is realized for those who suffered losses because of Madoff's admitted fraud. A separate Chapter 7 proceeding will unnecessarily reduce those recoveries.

Accordingly, SIPC and the Trustee for BLMIS hereby jointly move for substantive consolidation of the Chapter 7 liquidation proceeding recently instituted against Madoff into the SIPA proceeding. For the legal and factual reasons set forth in detail below, it is respectfully submitted that this relief should be granted.

## Relevant Procedural History

On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home and was criminally charged with a multi-million dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. 240.10b-5 in the United States District Court for the Southern District of New York, captioned *United States v. Madoff*, No. 08 CV 2735 (the "Criminal Action").[4] Also on December 11, 2008 (the "Filing Date"),[5] the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against defendants Bernard L. Madoff and BLMIS

---

[4] On March 10, 2009, the criminal case was transferred to Judge Denny Chin in the United States District Court for the Southern District of New York and was assigned a new docket number, No. 09 CR 213 (DC).

[5] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under section 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

(together, the "Defendants") (Case No. 08-CV-10791) (the "SEC Action"). The complaint alleged that the Defendants engaged in fraud through investment adviser activities of BLMIS.

On December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order in the SEC Action which appointed Lee S. Richards, Esq. as receiver (the "Receiver").

On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the SEC Action with an application of SIPC. Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA;

(b)     appointed Baker & Hostetler, LLP ("B&H") as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(c)     removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

On December 18, 2008, the District Court entered the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction Order"). Among other things, the Preliminary Injunction Order clarified that the Receiver is only appointed as to assets concerning the London entity, Madoff Securities International Ltd. On February 26, 2009, the Receiver submitted a report and application to terminate the receivership to the District Court. After receipt of submissions by the Trustee, the

SEC, and the Department of Justice, and after a hearing on March 23, 2009, the District Court issued an order discharging the Receiver and terminating the receivership.

At a plea hearing (the "Plea Hearing") on March 12, 2009 in the Criminal Action, Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering and theft and embezzlement, filed against him by the United States Attorney's Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23:14-17.) Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (Id. at 23:20-21.)  Madoff filed a plea allocution describing some of the details of his fraud (the "Allocution"), No. 09-213 [Dkt. No. 50].

On April 10, 2009, the District Court entered an order (the "April 10 Order") modifying article V of the Preliminary Injunction Order to allow The Blumenthal & Associates Florida General Partnership, Marc Cherno, Judith Rock Goldman, the Horowitz Family Trust, Steven Morganstern, M.D., the Rappaport Charitable Remainder Unitrust and Martin Rappaport (collectively, the "Petitioners") to file an involuntary bankruptcy petition against Madoff (the "Petition").  On April 13, 2009, the Petition was filed against Madoff by the Petitioners in the Bankruptcy Court for the Southern District of New York (09-11893 (BRL)) (the "Madoff Bankruptcy Case"), attempting to ensure that Madoff's assets be liquidated in an orderly manner and to maximize the value of such assets for the benefit of the investors that Madoff defrauded. See Brief of Movants at 4, SEC v. Madoff, et al., No. 08-Civ-10791 (S.D.N.Y., April 1, 2009) [Dkt. 37].  On April 14, 2009, the District Court entered an amendment to the April 10 Order (the "April 14 Amendment").

On April 20, 2009, this Court entered an order in the Madoff Bankruptcy Case directing the United States Trustee to appoint an interim trustee pursuant to Section 303(g) (the "Appointment Order"). The Appointment Order further directed the interim trustee to, upon appointment, confer with the Trustee to develop protocols for the coordination of the Madoff Bankruptcy Case with this SIPA liquidation of BLMIS. On April 21, 2009, the United States Trustee filed a Notice to Interim Trustee of Appointment, appointing Alan Nisselson, Esq., as interim trustee.

Also on April 20, upon an ex parte application by the United States Attorney's Office for the Southern District of New York ("USAO"), Judge Chin issued a post-indictment restraining order in the Criminal Action (the "Restraining Order"). In pertinent part, the Restraining Order restrained Madoff and Ruth Madoff from the transfer or dissipation of assets subject to forfeiture. The Restraining Order exempts the USAO from the foregoing provisions, and further states that the USAO may provide specific written authorization to third parties to take actions otherwise prohibited by the Restraining Order.

### Relevant Factual Background

I. **Madoff and BLMIS**

    1. **History of BLMIS**

BLMIS had its principal place of business in New York and engaged in three primary types of business: market making, proprietary trading and investment advisory services. BLMIS was registered with the SEC as a broker-dealer and beginning in 2006 as an investment adviser. Pursuant to such registration as a broker-dealer, BLMIS was a member of SIPC.

Madoff founded BLMIS in 1960, initially as a sole proprietorship. On or around December 4, 2000, it was reorganized as a single member LLC. Until his arrest on December

11, 2008, Madoff was the sole member of the limited liability company and its chairman.  In this

capacity, Madoff controlled all of the business activities of BLMIS.

Madoff represented to clients and prospective clients that he would invest their money in

shares of common stock, options and other securities and would, at their request, return profit

and principal.  See Allocution at pg. 1.  As the world is now aware, no such securities were

purchased by Madoff.

In pleading guilty to the crimes he committed, Madoff admitted that since at least the

early 1990's the investment advisory business part of BLMIS was used to operate a Ponzi

scheme.[6]  See Allocution at p. 2.  Madoff solicited billions of dollars under false pretenses and

failed to invest investors' funds as promised.  Instead, he deposited investors funds in a bank

account at Chase Manhattan Bank.  See Allocution at pg. 1.  In his Allocution, Madoff also

described how he moved funds between this account and other BLMIS accounts in an attempt to

conceal the fraud.  See Allocution at pg. 4.

### 2.    Payments from BLMIS

The books and records of BLMIS show that in the past seven years and perhaps longer,

Madoff received a cash draw from BLMIS at irregular intervals, essentially whenever he decided

that he needed funds.  For example, in 2007 Madoff had cash draws close to $5 million,

including one payment of $2 million on a single day.  See Slattery Affidavit at ¶ 12.  Madoff had

no other significant source of income during this period.  Id. at 13.

### 3.    Misuse of BLMIS Funds

Madoff treated BLMIS bank accounts as his own and used customer property entrusted to

him and BLMIS by customers to fund his and his family members' expenses.  The following are

just seven of countless examples of Madoff's misuse of BLMIS funds:

---

[6] The Trustee is investigating whether the fraud at BLMIS extends back further than the early 1990's.

- Pursuant to a promissory note dated December 12, 2007, Madoff made a loan in the principal amount of $9 million to his brother, Peter Madoff. The note, a copy of which is attached as Exhibit 4 to the Slattery Affidavit, was payable to Madoff personally. Despite the fact that Madoff is listed as the payee on the note, the money used to fund this loan came exclusively from a BLMIS bank account. BLMIS received no apparent benefit from this loan. No record has been found of any interest or principal ever being paid to BLMIS. See Slattery Affidavit at ¶ 14.

- BLMIS funds were used to make loans in Madoff's name to Madoff Technologies, LLC, an entity in which various Madoff family members own a majority interest. Pursuant to a promissory note dated October 31, 2000, a copy of which is attached to the Slattery Affidavit as Exhibit 5, Madoff purportedly loaned approximately $5.5 million to Madoff Technologies LLC. Despite the fact that Madoff is listed as the payee on the note, the money used to fund this loan came from a BLMIS bank account and, again, there was no apparent benefit to BLMIS for this loan. See Slattery Affidavit at ¶ 15.

- BLMIS funds were used to make capital contributions in the amount of $1,700,000 to an entity named Madoff Energy Holdings LLC ("Madoff Energy"). Madoff Energy is owned in equal shares by Mark Madoff and Andrew Madoff (Madoff's sons), and Shana Madoff (Madoff's niece). While Madoff used BLMIS funds to make capital contributions to Madoff Energy, there is no evidence that BLMIS received any dividends or repayment made by Madoff Energy. There was no benefit to BLMIS for this loan. See Slattery Affidavit at ¶ 16.

- The books and records of BLMIS show that Madoff used BLMIS funds to satisfy capital calls on his wife Ruth Madoff's behalf to Sterling American Property IV, Sterling American Property V and other Sterling entities. Amounts paid to Sterling entities exceed $4.5 million. While Madoff used BLMIS funds to satisfy the capital calls, Ruth Madoff, and not BLMIS, received all dividends paid out by the Sterling American entities. There was no benefit to BLMIS. See Slattery Affidavit at ¶ 17.

- Madoff used BLMIS funds to purchase assets for his personal enjoyment and that of his family. Madoff and his family created a web of shell companies to hold these assets after purchasing these assets with BLMIS funds. For example, BLMIS funds were used to purchase two yachts, the first in 2003 and the second in 2007, with a total value of over $11.5 million. These yachts were used

by Madoff and his family and served no business purpose. The second yacht, named Bull, is held by Yacht Bull Corporation, a corporation in which Ruth Madoff has an alleged interest. Despite the fact that BLMIS fully paid for the yacht, BLMIS is not listed as its owner in the books and records. See Slattery Affidavit at ¶ 18.

- BLMIS funds were also used to purchase ownership shares in private jets. Madoff organized a company, BLM Air Charter LLC, of which he was the sole member, and used that company to hold the aircraft interests. The funds used to make the purchases came from BLMIS. He and his family used the aircrafts for their personal travel. It appears that when Madoff became concerned about potential personal liability related to the aircraft, he transferred the economic interest in BLM Air Charter LLC to BLMIS, thus ensuring he could retain the benefit of the airplanes while passing the risk on to BLMIS. See Slattery Affidavit at ¶ 19.

- BLMIS funds were sent to two law firms for the benefit of Andrew Madoff in the amounts of $430,000 and $4,055,000 on September 12 and October 1, 2008, respectively. See Slattery Affidavit at ¶¶ 20-21. It appears that at least one of these wire transfers was used by Andrew Madoff to purchase an apartment. See Slattery Affidavit at ¶¶ 20, 21, 22.

There are many more examples demonstrating Madoff's complete disregard for any corporate formality. As detailed above, Madoff made transfers of BLMIS funds for the benefit of his family and employees. See, e.g., Slattery Affidavit at ¶¶ 20-27. Madoff put his personal employees who did not work for BLMIS on the BLMIS payroll. See Slattery Affidavit at ¶ 32. He used BLMIS funds to pay for country club memberships for himself and other family members and provided corporate credit cards to members of his extended family, for which BLMIS paid the bill each month. See Slattery Affidavit at ¶¶ 31, 35. While not exhaustive, the above listed items demonstrate that Madoff used and abused BLMIS property, and that he deemed BLMIS property to be his own, to the detriment of all his victims who entrusted BLMIS with their customer property.

## II.      The Trustee's Administration of the BLMIS Estate

As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  Pursuant to section § 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA.  Pursuant to section § 78fff(b) of SIPA, Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

Consistent with his duties, the Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.  The Trustee has recovered approximately one billion dollars in assets to date.

In addition, the Trustee recently sent demand letters to 223 entities seeking the voluntary return of more than $735 million, which is recoverable under the Trustee's avoidance powers. Previously, demand letters were sent to "feeder funds" demanding the return of billions of dollars in recoverable payments.  To the extent that parties refuse to return customer property within their possession that is owed to the Trustee, he is prepared to commence numerous avoidance actions.  To date, the Trustee has commenced three avoidance actions.  He is currently negotiating settlements with a number of entities who received preferences and/or fraudulent transfers.  The Trustee expects to present such settlements to the Court in the near future.

Because the Trustee represents the interests of all the customers in BLMIS, he holds the largest claim in the Madoff Chapter 7 case.

## Legal Argument

The Trustee and SIPC have moved for substantive consolidation of the estate of Madoff into the SIPA proceeding of BLMIS based upon the fact creditors dealt with Madoff and BLMIS as a single economic unit, the intertwined financial affairs between Madoff and BLMIS, the

benefits that could be realized for BLMIS's customers and its estate upon a substantive consolidation, and the lack of prejudice to Madoff's creditors. A consolidation of the two proceedings will maximize possible recoveries for customers who suffered significant losses from Madoff's of BLMIS's joint fraud.

## I.    The Legal Standard for  Substantive Consolidation has Been Satisfied

The power to consolidate substantively interrelated cases arises from the inherent equitable powers of the Court and under section 105(a) of the Bankruptcy Code, which allows the court to issue orders necessary to carry out the provisions of the Bankruptcy Code. Numerous courts have stated that the appropriateness of such consolidation is to be determined on a case-by-case basis. FDIC v. Colonial Realty Co., 966 F.2d 57, 59 (2d Cir. 1992).

In deciding whether to consolidate, a number of earlier cases relied on the presence or absence of certain elements that are similar to factors relevant to piercing the corporate veil under applicable state law. See, e.g., In re Gulfco Inv. Corp., 593 F.2d 921 (10th Cir. 1979). These elements include:

(1)    the presence or absence of consolidated financial statements;

(2)    the unity of interest and ownership between various corporate entities;

(3)    the existence of parent and intercorporate guarantees on loans;

(4)    the degree of difficulty in segregating and ascertaining individual assets and liabilities;

(5)    the existence of transfers of assets without formal observance of corporate formalities;

(6)    the commingling of assets and business functions; and

(7)    the profitability of consolidation at a physical location. In re GC Cos., Inc., 274 B.R. 663, 672 (Bankr. D. Del. 2002).

More recent cases, however, while not ignoring those elements, have applied a less mechanical approach.  Thus, for example, the Second Circuit Court of Appeals in In re Augie/Restivo Banking Co., Ltd, 860 F.2d 515 (2d Cir. 1988), concluded that the extensive list of elements and factors frequently cited and relied upon by other courts in determining the propriety of substantive consolidation are "merely variants on two critical factors: namely, '(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit . . .' or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors . . . " Id. at 518.  A recent Third Circuit decision, In re Owens Corning, 419 F.3d 195 (3d Cir. 2005), is consistent with, and cites with approval, the holding in Augie/Restivo.

Even where there is no showing of creditor reliance on two entities constituting a single economic unit, however, the Court may invoke its broad equitable powers to consolidate.  In re Commercial Envelope Mfg. Co., 14 C.B.C. 191, 196 (Bankr. S.D.N.Y. 1977); see also In re 599 Consumer Elec. Inc., 195 B.R. 244, 250 (S.D.N.Y. 1996) ("[a] finding that creditors knew they were dealing with separate entities does not necessarily preclude substantive consolidation on the ground that it is impossible or prohibitively expensive to unravel the debtors' commingled finances").  Consolidation based upon entanglement of the debtor's affairs is justified when the time and expense necessary to attempt to unscramble those affairs is so substantial that the realization of any net assets for creditors is threatened or when no accurate identification and allocation of assets is possible.  In re Augie/Restivo Baking Co., Ltd., 860 F.2d at 518-19.  The ultimate test for substantive consolidation adopted by the Second Circuit in Augie/Restivo is "ensur[ing] the equitable treatment of all creditors." Id. at 518.

A significant factor to be considered by the Court in considering whether to authorize substantive consolidation is the prejudicial effect of consolidation on creditors and parties in interest that relied solely upon one of the entities to be consolidated. See Augie/Restivo Banking Co., Ltd., 860 F.2d at 519.

The doctrine of substantive consolidation has also been applied to SIPA and stockbroker liquidation cases. See, e.g., In re Baker & Getty Fin. Servs., Inc., 106 F.3d 1255 (6th Cir. 1997) (applying stockbroker liquidation provisions to substantively consolidated estates under subchapter III of chapter 7 of the Bankruptcy Code); In re Lewellyn, 26 B.R. 246 (Bankr. S.D. Iowa 1982) (consolidating the bankruptcy estate of the debtor with the bankruptcy estate of the debtor's former principal in a SIPA case). In Lewellyn, the Bankruptcy Court determined that "[t]here is no reason that the [SIPA Trustee] should not act as the trustee of consolidated estates." 26 B.R. at 253-54.   This Court also authorized the substantive consolidation of a company subject to a SIPA proceeding with a non-debtor entity in In re Park South Securities, LLC, No. 03-8024A (RDD) (Bankr. S.D.N.Y.).   See Order Substantively Consolidating the Assets and Liabilities of Eberhard Investment Associates, Inc. with the Estate of Park South Securities, LLC, in Liquidation, September 10, 2003 [Dkt. 27].

## II.    The Facts of this Case Warrant Substantive Consolidation

Applying the applicable case law to the facts of this case, it is clear that the substantive consolidation of Madoff's Chapter 7 case into the BLMIS proceeding is appropriate.

### 1.    Madoff and BLMIS were a single economic unit

The facts in this case demonstrate that Madoff and BLMIS were a single economic unit. There is complete unity of interest and ownership between Madoff and BLMIS.  Madoff is the sole member of BLMIS and, until his arrest, controlled all its activities as its chairman.  Madoff has admitted that he moved monetary assets of BLMIS from account to account on a whim in an

attempt to conceal his fraud, thus demonstrating a complete lack of observance of any corporate

formalities.  See Allocution at pg. 4.

Failure to adhere to corporate formalities is also evidenced by BLMIS tax treatment.  To

date, no evidence has been found that Madoff elected to have BLMIS treated as a corporation for

federal tax purposes.  With a single member LLC, where no such election is made, the LLC is

referred to as an entity disregarded as separate from its owner, or a "disregarded entity."  As

such, BLMIS was not required to file an income tax return pursuant to Treasury Regulation

301.7701-3(b)(1).  Indeed, there is no evidence to date that any tax returns were ever filed on

behalf of BLMIS by Madoff.  Instead, he prepared joint returns with his wife, Ruth Madoff, on

which business income was reported.  See Slattery Affidavit at ¶ 11.  This suggests a total

consolidation of financial affairs between BLMIS and Madoff.

The lease to the premises in which BLMIS operated was held in the name of Madoff

individually and not in the name of BLMIS.  Despite the name on the lease, BLMIS funds were

used to pay the rent each month.  See Slattery Affidavit at ¶ 28.  Likewise, though Madoff filed a

New York City commercial rent tax return in his own name and not that of BLMIS, BLMIS

funds were used to pay the return.    See Slattery Affidavit at ¶ 29.  Whether in the name of

Madoff or BLMIS, Madoff maintained no distinction between assets and liabilities held in the

name of each.

As a functional matter, Madoff was the public face of the company and personally

recruited new investors.  Individuals and other entities that invested funds with BLMIS believed

that they were investing with Madoff and were going to benefit from his particular investment

skills.  From a customer's perspective, BLMIS and Madoff constituted a single economic unit.

Indeed, the wire instructions provided to customers by BLMIS provided that the funds should be

sent to the BLMIS account at J.P. Morgan Chase Bank, "For Further Credit to Bernard L. Madoff." <u>See</u> Slattery Affidavit at ¶ 9.    It is impossible to determine where the BLMIS estate ends and the Madoff estate begins because there is complete overlap between the two.

        **2.**        **The accounts of Madoff and BLMIS are hopelessly entangled**

There is no way to separate the affairs of Madoff from those of BLMIS.  There was absolutely no segregation of assets and liabilities.  In effect, Madoff treated BLMIS as his personal bank account, taking funds when he felt he needed them or transferring funds to other Madoff entities or family members when it suited his whim and purposes.  This caused BLMIS to dole out at least hundreds of millions of dollars to fund everything from personal loans to personally-held real estate transactions on behalf of Madoff's family members to the decadent lifestyle afforded Madoff and his family solely because of his fraud.

To Madoff, there were virtually no restrictions on the purposes for which BLMIS funds could be used.  At times, Madoff simply transferred BLMIS funds to Madoff family members directly.  <u>See</u> Slattery Affidavit at ¶ 34.  At other times, Madoff used BLMIS funds to make capital contributions to various investment vehicles, in which Madoff family members were personally invested and in which BLMIS had no interest.  <u>See</u> Slattery Affidavit at ¶¶ 15-17.

In addition, Madoff caused BLMIS to dole out millions of dollars in loans to Madoff family members for which Madoff, and not BLMIS, was the payee.  <u>See</u> Slattery Affidavit at ¶ 14.  There is no evidence that BLMIS received any benefit for these loans.  In certain instances, these loans were used to purchase personal real estate by Madoff family members.  <u>See</u> Slattery Affidavit at ¶ 25.  Beyond his family members, Madoff also transferred BLMIS funds for the purchase of personal real estate for at least one loyal employee who worked in the investment advisory arm of BLMIS.  <u>See</u> Slattery Affidavit at ¶¶ 26-27.

As is described above, Madoff used BLMIS customer property to enhance his lavish lifestyle. For example, Madoff used BLMIS funds to purchase boats and airplanes for his personal use. <u>See</u> Slattery Affidavit at ¶¶ 18-19. BLMIS funds were used to make payments to a marina located near Madoff's Montauk estate. <u>See</u> Slattery Affidavit at ¶ 30. Madoff placed his boat captain, his maid, and his house-sitter in Florida on the BLMIS payroll, paying them directly from BLMIS. <u>See</u> Slattery Affidavit at ¶ 32. On behalf of himself and his wife, and his brother and his wife, Madoff paid hundreds of thousands of dollars to at least four country clubs directly from BLMIS bank accounts. <u>See</u> Slattery Affidavit at ¶ 31.

The benevolence of BLMIS was bestowed on Madoff family members and friends in innumerable ways. For example, Madoff family members, even those who did not work for BLMIS, such as Deborah West Madoff (Andrew Madoff's wife), and Marion Madoff (Peter Madoff's wife), each had corporate American Express cards for which BLMIS paid the bill each month. Even Madoff's boat captain in Florida had a corporate Amex card. <u>See</u> Slattery Affidavit at ¶ 35.

In essence, the funds of BLMIS supported Madoff and his family's lifestyle and Madoff used BLMIS funds in customer accounts as though they were his own. Madoff did not treat his assets or liabilities as separate and distinct from those of BLMIS. He entered into transactions that would be difficult to undo for the benefit of BLMIS customers without the substantive consolidation of Madoff's estate into the BLMIS proceeding.

Other than the customer property that Madoff may have misappropriated from the accounts of BLMIS's customers and the draw paid by BLMIS to him, Madoff does not appear to

have had any other significant source of income.  See Slattery Affidavit at ¶ 13.[7]  Thus, Madoff

does not have any property that is not "customer property" within the meaning of SIPA.  All of

Madoff's assets should therefore be liquidated for the benefit of BLMIS customers.

BLMIS's estate is legitimately entitled to recover the assets in Madoff's estate acquired

through his misdeeds, using the Trustee's avoidance powers and other causes of action that the

Trustee has against Madoff.  The Trustee has a duty to recover all possible BLMIS property for

distribution to customers of BLMIS and intends to pursue aggressively avoidance actions against

Madoff.  BLMIS's customers will benefit from the substantive consolidation because Madoff's

assets will be available without the expense and delay of avoidance actions that would otherwise

have to be brought by the Trustee.  It is not a question of whether the customers have rights to

these assets; they clearly do.  The only issue is how to recover those assets for the defrauded

customers of BLMIS in the most expeditious, efficient, and economical fashion.

**3.      Creditors will benefit from substantive consolidation and will not be prejudiced**

Creditors of Madoff will not be harmed by a substantive consolidation of the Madoff

estate with the BLMIS proceeding and instead, they will be benefitted by consolidation.  Indeed,

there is almost complete overlap between entities with claims against BLMIS and those that have

claims against Madoff.  The Trustee's claims on behalf of customers is the largest claim in the

Chapter 7 bankruptcy case.  In addition, entities with claims against BLMIS also have a claim

against Madoff because of his admitted fraud.  The Trustee believes that there are few, if any,

entities with claims solely against Madoff, and to the extent such entities exist, their claims are

---

[7] Madoff reported business income on his personal tax return.  On their amended joint tax return for 2007, the only year for which the Trustee has returns, Madoff and his wife reported business income $9.4 million, however no supporting schedule was attached to the return.  See Slattery Affidavit at ¶ 11.

*de minimis.*[8]   As such, there is little cause for concern that creditors of Madoff would be prejudiced by the substantive consolidation of the two estates.[9]

Further, substantive consolidation will not prejudice Madoff's creditors (if there are even creditors of Madoff himself who are not also creditors of BLMIS) because, regardless of the consolidation, the Trustee has a superior claim to substantially all of Madoff's estate.  Madoff is a transferee of BLMIS assets and the Trustee has the right, pursuant to section 550(a) of the Bankruptcy Code, to recover those assets.  In addition, all customers of BLMIS, whether they invested directly or through an intermediary, will receive their *pro rata* share of the liquidation proceeds either directly from the Trustee or through their intermediary.  As such, there is no additional protection provided by the Chapter 7 bankruptcy to customers who invested through an intermediary.  In fact, because having two proceedings will increase expenses, there will actually be a decreased recovery.

### 4.     Substantive consolidation is administratively efficient and economical

If the Madoff estate were to be consolidated with the SIPA proceeding of BLMIS, the Trustee would be the sole fiduciary, which presents the best and most economical opportunity to maximize recoveries.   A single fiduciary would reduce the complications associated with attempting to coordinate the administration of two estates, and would allow the most efficient and economical administration of the assets for the benefit of stakeholders.

---

[8] To the extent any such creditors do exist, the Trustee, following consolidation, will evaluate and address these claims on an individual basis.

[9] In the April 10 Order, the District Court stated that "distribution under SIPA goes to those who invested in BLMIS directly as its "customers" rather than the substantial number of those whose losses stemmed from investments through intermediaries."  See April 10 Order at pg. 2.  The District Court amended this statement in the April 14 Amendment by stating that investors who invested in BLMIS through intermediaries still receive their full share of the proceeds of the BLMIS liquidation.  See April 14 Amendment at pg. 1.  The fact of the matter is that all investors in BLMIS will recover their *pro rata* share of the proceeds of the liquidation, regardless of whether they invested through intermediaries or not.  As such, there is nothing to be gained from having a separate administration of Madoff's Chapter 7 case.

The Trustee has already begun to encounter such complications.  For example, despite the fact that while, as discussed above, Madoff purchased interests in two aircraft using BLMIS money, he retained personally a non-economic interest in the company that holds the airplanes, which clouds clear title to the aircraft interests.  These interests should be liquidated for the benefit of BLMIS customers.  BLMIS provided the funds to purchase the interests and the interests are now held by a shell company, the economic interest in which has been assigned to BLMIS.  However, the non-economic interest retained by Madoff provides a barrier to the Trustee's ability to provide clear title to a potential purchaser.  Without substantive consolidation, the Trustee would have to take several additional steps in order to sell the interest in the airplanes, including, either obtaining relief from the stay, or the consent of the Chapter 7 trustee before proceeding with the sale of the asset.  The Trustee would also have to engage in negotiations with the Chapter 7 trustee regarding what, if any, value this non-economic interest has.  Moreover, the terms of the Restraining Order, supra, at p. 8, require the Trustee to obtain prior written authorization from the USAO prior to taking any action with respect to the assets of Madoff and Ruth Madoff, some of which may properly be deemed to be assets of BLMIS.

In addition, the lease to the BLMIS premises at 885 Third Avenue in New York City is held in the name of Madoff in his individual capacity.  The inability of the Trustee to transfer the lease to a purchaser of the market-making platform, if necessary, has complicated the Trustee's efforts in connection with that sale.  If Madoff's estate were consolidated with the BLMIS proceeding, such complications could be prevented and barriers for maximum recovery on behalf of customers would thus be avoided.

There are also economic benefits to substantive consolidation.  While the Trustee has the upmost respect for Mr. Nisselson, the Chapter 7 Trustee, the Trustee notes that a Chapter 7

trustee has a vested interest in any recoveries in the Madoff estate due to the commission payable pursuant to the Bankruptcy Code. Section 326 of the Bankruptcy Code provides that a Chapter 7 trustee is eligible to receive a commission equal to, effectively, up to three percent of monies in excess of $1 million disbursed or turned over to parties in interest in a case. This could potentially lead to a situation in which the Chapter 7 trustee may be unwilling to cooperate with the liquidation of an asset that the Trustee believes is in the best interest of the BLMIS estate, again causing delay and the related higher cost, which will ultimately lead to a lower recovery for the victims of Madoff's fraud.

Finally, the fact that a SIPA trustee would be administering the two proceedings in and of itself ensures that there will be a greater recovery for defrauded customers of BLMIS and Madoff. SIPC funds all of the expenses of a SIPA liquidation to the extent the BLMIS general estate is insufficient, and, as such, any and all funds recovered by the Trustee will be passed along to customers. This is not the case in a Chapter 7 proceeding. In a Chapter 7 case, the trustee and all of his professionals are paid out of the proceeds of the liquidation, thereby reducing the amount available to pay investors by the amount of the Chapter 7 trustee's fees and commissions and the fees of any attorneys, financial advisors and other professional retained by the trustee.

With these facts and authorities in mind, the Trustee and SIPC believe that the facts amply warrant entry of an order consolidating the assets and liabilities of the Madoff estate into the SIPA proceeding of BLMIS, and that that relief will further SIPA's goals of restoring public confidence in the securities market, determining and paying qualified customer claims expeditiously and marshaling assets efficiently.

## <u>CONCLUSION</u>

WHEREFORE, the Trustee and SIPC respectfully request entry of an Order substantively consolidating the Madoff estate and the estate of BLMIS and granting such other and further relief as is just and proper.

Dated: New York, New York                    Respectfully submitted,
      May 05, 2009


                                      /s/ David J. Sheehan
                                      Baker & Hostetler LLP
                                      45 Rockefeller Plaza
                                      New York, New York 10111
                                      Telephone: (212) 589-4200
                                      Facsimile: (212) 589-4201
                                      David J. Sheehan
                                      Email: dsheehan@bakerlaw.com
                                      Marc Hirschfield
                                      Email: mhirschfield@bakerlaw.com
                                      Seanna R. Brown
                                      Email: sbrown@bakerlaw.com

                                      *Attorneys for Irving H. Picard,*
                                      *Trustee for the SIPA Liquidation of Bernard L.*
                                      *Madoff Investment Securities LLC*


                                      /s/ Kevin H. Bell
                                      Securities Investor Protection Corporation
                                      805 Fifteenth Street N.W., Suite 800
                                      Washington D.C. 20005
                                      Telephone: (202) 371-8300
                                      Facsimile:  (202) 371-6728
                                      Josephine Wang
                                      General Counsel
                                      Email: jwang@sipc.org
                                      Kevin H. Bell
                                      Senior Associate General Counsel for Dispute Resolution
                                      Email: kbell@sipc.org